IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**RUDY TORRES,**

               Plaintiff,

   vs.                                   No. CIV 10-1133 WJ/LFG

**MICHAEL J. ASTRUE,**
**Commissioner of the**
**Social Security Administration,**

               Defendant.

## REPORT AND RECOMMENDATION[1]

**THIS MATTER** is before the Court on Plaintiff Rudy Torres's ("Torres") Motion to Reverse or Remand Administrative Decision. [Doc. 15, 16.] The Commissioner of Social Security issued a final decision denying benefits, finding that Torres was not disabled and not entitled either to Disability Insurance Benefits ("DIB") or Supplemental Security Income ("SSI"). The Commissioner filed a response to Torres's Motion [Doc. 17]; Torres did not file a reply, and the time for doing so has passed. Having considered the pleadings submitted by the parties, the administrative record and the applicable law, the Court recommends that Torres's motion to reverse/remand should be denied and that this matter be dismissed, with prejudice.

---

[1]Within fourteen (14) days after a party is served with a copy of this analysis and recommended disposition, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such analysis and recommendation. A party must file any objections within the fourteen-day period allowed if that party wants to have appellate review of the analysis and recommendation. If no objections are filed, no appellate review will be allowed.

## I.  PROCEDURAL RECORD

In March 2008, Torres applied for DIB and SSI, alleging he was disabled from February 1, 2008, due to a back injury, hypertension ("HTN") or high blood pressure, and chronic bronchitis. [AR 15, 51, 92, 143.]  Torres's applications were denied at the initial and reconsideration levels. [AR 86-89, 92, 97.]  On September 30, 2009, the ALJ conducted a video hearing from Albuquerque, New Mexico.  Torres was present with counsel in El Paso and could be seen by the ALJ on a video monitor. [AR 47, 49.]  On February 18, 2010, the ALJ issued his decision finding that Torres was not disabled. [AR 11-20.]  Thereafter, Torres filed a request for review.  On September 21, 2010, the Appeals Council denied Torres's request for review and upheld the final decision of the ALJ. [AR 1.]  On November 29, 2010, Torres filed his Complaint for court review of the ALJ's decision. [Doc. 1.]

Torres was born on June 8, 1955, and was 54 years old at the time of the hearing. [AR 18, 136.] He obtained a G.E.D. in about 1973. [AR 18, 74, 86.] Torres served in the military from December 1973 through January 1975. [AR 115.]  He was never married and either lives alone or with roommates, or is homeless.  [AR 66, 115.] Torres worked previously as a tire/lube technician and as a sandblaster. [AR 17.]  His earnings from 1973 to 2009 were very erratic.  For example, in 1973, he earned less than $300.  In 2007, he earned over $16,000.  He often earned less than $10,000 a year. [AR 125.]

## II.  STANDARDS FOR DETERMINING DISABILITY

In determining disability, the Commissioner applies a five-step sequential evaluation process.[2]  The burden rests upon the claimant to prove disability throughout

---

[2]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

the first four steps of this process, and if the claimant is successful in sustaining his burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[3]

Briefly, the steps are: at step one, claimant must prove he is not currently engaged in substantial gainful activity;[4] at step two, the claimant must prove his impairment is "severe" in that it "significantly limits his physical or mental ability to do basic work activities . . . .;"[5] at step three, the Commissioner must conclude the claimant is disabled if he proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[6] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[7]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[8] age, education and past work experience, he is capable of performing other work.[9]

---

[3] 20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[4] 20 C.F.R. § 404.1520(b) (1999).

[5] 20 C.F.R. § 404.1520(c) (1999).

[6] 20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means his impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[7] 20 C.F.R. § 404.1520(e) (1999).

[8] One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[9] 20 C.F.R. § 404.1520(f) (1999).

At step five, the ALJ can find that the claimant met his burden of proof in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids."  Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997).  For example, expert vocational testimony might be used to demonstrate that the claimant can perform other jobs in the economy.  Id. at 669-670.  Before applying the grids, the ALJ must first find the following:  "(1) that the claimant has no significant non-exertional impairment; (2) that the claimant can do the full range of work at a particular residual functional capacity on a daily basis; and (3) that the claimant can perform most of the jobs in that residual functional capacity category."  Id. at 669 (*relying on* Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir. 1993)).  If, at step five of the process, the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove he cannot, in fact, perform that work.[10]

In this case, the ALJ relied on the vocational expert's testimony in reaching his decision at step five of the analysis. [AR 19-20.]

### III.  STANDARD OF REVIEW

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004).  The Court's

---

[10]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

review of the Commissioner's determination is limited.  Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence.  Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal also exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards.  Hamlin, 365 F.3d at 1114.

It is of no import whether the Court believes that a claimant is disabled.  Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied.  Hamilton, 961 F.2d at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

After carefully reviewing all of the evidence, the ALJ denied Torres's requests for benefits. [AR 11-20.]  The ALJ determined, in part, that Torres had not engaged in substantial gainful activity since February 1, 2008, the alleged onset date.  Torres had severe impairments consisting of degenerative disc disease and "history of depression." [AR 13.]  None of Torres's impairments or combination of impairments met listing

criteria. [AR 13-14.]

The ALJ further determined that Torres had the RFC to perform light work except that he was limited to occasional climbing of ramps or stairs and could not climb ladders, ropes, and scaffolds. He could only occasionally engage in activities that required balancing, stooping, crouching, or crawling. He could concentrate for two hour segments but had to take a break before returning to another two-hour work segment. Torres could respond to changes in a routine work setting. [AR 14-15.]

The ALJ designated this category of limitations as RFC No. 1. In addition, the ALJ described RFC No. 3 as including the limitations in RFC No. 1 but also requiring that Torres be afforded a sit-stand option, one to two minutes every hour or so. [AR 14.] The ALJ considered the medical evidence and decided that while Torres's medically determinable impairments could reasonably be expected to cause the alleged symptoms, his statements concerning the intensity, persistence and limiting effects of the symptoms were not credible "to the extent they were inconsistent with the above RFC." [AR 15.] Torres was unable to perform any past relevant work, e.g., as a tire/lube technician or sandblaster because the previous work was not within a range of light work. [AR 17.]

The ALJ determined that transferability of job skills was [not] material to the determination of disability because using the grids supported a finding that Torres was "not disabled," whether or not he had transferable job skills.[11] The ALJ proceeded by discussing the VE's testimony about the possibility that Torres could perform sedentary work as a dispatcher, in part due to his prior general knowledge of automobiles. The ALJ

---

[11]The actual sentence in the ALJ's decision omits the word "not" before material but as read, it makes sense that the ALJ intended to say "not material." [AR 18.]

stated that it appeared that if Torres was limited to sedentary level work, he could still perform the dispatcher position.  The ALJ designated this limitation as RFC No. 4.  This was an alternative ruling by the ALJ, who explained that "if for any reason the claimant is deemed capable of only sedentary work then he can still work at that level." [AR 18.]

After considering Torres's age, education, work experience, and RFC, the ALJ decided that there were jobs in significant numbers in the national economy that Torres could perform.  In reaching his ultimate conclusions, the ALJ relied on the VE's testimony.  [AR 19-20.]

## IV.  MEDICAL HISTORY

### *2005 Records*

There is a single medical record dated August 16, 2005, when Torres was seen at Ben Archer Health Center in Las Cruces for complaints of abdominal itching.  [AR 312.]

### *2006 Records*

On February 6, 2006, Torres was again seen at Ben Archer for a physical.  He had no complaints although he sometimes felt pain in his left shoulder.  The health care provider noted a history of alcoholism or drinking.  [AR 310, 348.]

On June 21, 2006, Torres complained of a rash in the groin area.  His blood pressure was high but he took no medications.  [AR 309.]  On July 14, his blood pressure was checked and hypertension is noted in the record.  Torres had not purchased the appropriate medications but was watching his diet.  His hypertension was improving, and he was prescribed medications, including HCTZ (used to treat high blood pressure or hypertension) and Tricor (used with a low-fat diet to help reduce the amounts of fatty substances such as cholesterol and triglycerides in the blood).  Torres was provided

7

dietary advice and a recommendation to exercise.  [AR 308.]  On August 25, Torres was seen at Ben Archer to obtain refills on his medications.  He complained of throbbing in his fingers for about three months.  He also complained of allergies, itching, and pain with stiffness.  He was taking Ibuprofen (400 mg) at this time and said it helped.  His hypertension was stable.  [AR 307.]

On October 12, 2006, Torres was involved in a motor vehicle accident and injured although there are no contemporaneous medical records of treatment on or around that date.  [AR 292.]  On October 27, 2006, he attended a rehabilitation session related to the accident.[12]  The rehab record indicates Torres was seen at Mountain View Hospital in Las Cruces after his car accident and treated with Motrin.  Torres complained of more pain in his neck and back and was taking Ibuprofen.  He was not hospitalized. [AR 274.]

On exam, Torres's cervical range of motion ("ROM") was restricted and his lumbar spine ROM was 50% of normal.  The impression was: cervical dorsal and lumbar sprain and strain, along with a contusion to his right hand.  [275-76.]  He was prescribed Valium, Motrin, and Oxycodone.  Torres was released to light work activities if they were available.  He was not to lift more than 20 pounds above his chest and not to engage in repeated forward bending.  [AR 276.]

On November 20, 2006, Torres was seen at Rehabilitation and Occupational Medicine in Las Cruces to follow up on his lower back condition and neck pain.  He was currently working.   He had taken Motrin, Valium, and Oxycodone (narcotic pain

_____

[12]In 2006, there is a ledger documenting rehabilitation appointments, some of which were rescheduled or missed. [AR 261-64.]

reliever) which helped, but complained of pain radiating down his legs.  His cervical ROM was 50% of normal and he had swelling in his fingers.  His lumbar ROM also was 50% of normal.  Torres felt more pain on the right side.  The x-ray of his hand was negative. [AR 282.] The doctor ordered physical therapy and the record indicates Torres was to be "walked down" to see why he did not yet have an appointment.  MRIs of his spine were ordered.  Torres continued to have "quite a lot of symptoms six weeks" after his accident.  [AR 273.]  He could continue to work.

The MRI of Torres's lumbar spine on November 22, 2006 showed mild scattered degenerative endplate changes; no disc bulge or herniation at T12-L1; mild disc bulge at L1-2 and L2-3; mild disc bulge at L3-4 and superimposed broad central herniation; moderate disc bulge at L4-5; mild spinal stenosis; mild disc bulge at L5-S1; and superimposed mild to moderate central herniation.   The impression was multilevel lumbar spondylosis[13] and herniations.  [AR 281.]

The MRI of Torres's cervical spine showed no spondylolisthesis;[14] a 6 mm vertebral hemangioma of the C5 vertebral body; no disc bulge or herniation at any level; no stenosis; and normal signal.  [AR 279.]

On December 15, 2006, Torres was seen at Rehabilitation and Occupational Medicine for an initial physical therapy evaluation.  [AR 292.]  He rated his right neck pain as an 8 on a scale of 10.  Both sides of his lower back hurt him, again rated 8 of 10.

[13]"Spondylosis is a term referring to degenerative osteoarthritis of the joints between the centra of the spinal vertebrae and/or neural foraminae. In this condition the facet joints are not involved. If severe, it may cause pressure on nerve roots with subsequent sensory and/or motor disturbances, such as pain, paresthesia, or muscle weakness in the limbs." http://www.wikpedia.comhttp://en.wikipedia.org/wiki/Spondylosis (10/4/2011)

[14]"Spondylolisthesis is a condition in which a bone (vertebra) in the lower part of the spine slips out of the proper position onto the bone below it."

He rated the pain in his right knee as an 8 of 10, and his right hand finger as a 5 of 10. The impression was sprain/strain of the neck and back. The ROM in his lumbar back and neck were decreased. He was given exercises to do. [AR 292.]

### *2007 Records*

On February 23, 2007, Torres visited Ben Archer for refills on his medications for hypertension. He had no new complaints. He was to continue his exercises and healthy eating. [AR 305.]

On March 13, 2007, Torres was seen at Rehabilitation Medicine for his low back and neck pain. He had not been seen in three months but was "apparently" attending physical therapy session. Dr. Kennedy reviewed the November 2006 MRI scans with Torres. Dr. Kennedy felt that Torres could do a home exercise program and perform light duty activities. Torres requested a full work release. He rated his pain as a 5 out of 10. The record indicates Torres received prescriptions of Motrin, Valium, and Oxycodone in October 2006, and wanted refills in case his pain was "really bad." He was in no apparent distress on this date. [AR 269.]

On exam, his cervical ROM was good. There was very minimal tenderness. He had full ROM in his shoulders, elbows, and wrists and had full strength. [AR 270.] Torres's gait was unimpaired. There was no tenderness in the lumbar paraspinals. He stood erect and had full ROM in his lumbar spine. There were no complaints of pain with movement. Dr. Kennedy's impression was that Torres's cervical and lumbar sprain were much improved. Physical therapy was suspended in favor of home exercise. Based on the MRI, Dr. Kennedy noted that Torres did have "fairly significant findings" in the lumbar spine and that he was at risk for re-injury. Torres might need conservative

10

treatment at a later date and could consider surgery in the future if problems persisted. Dr. Kennedy limited his ability to work to the light category without repeated forward bending. Torres also was to be allowed frequent changes in position at work. [AR 271.]

On April 20, 2007, Torres was seen for allergies but had no new complaints. He drank a 12-pack of beer through the weekend. The record indicates "pre-HTN plus for alcohol." He was advised to drink less. [AR 304.]

On July 31, 2007, he complained of feeling tired and dizzy, and having shortness of breath. He had headaches and upper back pain with inspiration. He was coughing at night. Torres worked in sandblasting. [AR 303.] His chest x-ray on August 2 was positive for bronchitis. [AR 318.]

On September 6, 2007, Torres was seen at Rehabilitation Medicine. He complained of "moderate back pain and neck pain of one-year duration." He was there to obtain a rating of disability. He complained of neck and back spasms. [AR 265.] The doctor noted that on exam, Torres had limited flexion in his cervical spine, limited right and left bending, non-painful Spurlings, and tender right paraspinals. His flexion was limited and painful. His mental faculties appeared intact. [AR 265.] He exhibited 5 of 5 strength at the shoulders, elbows and in his grip. His hips, knees and ankles were 5 of 5 for strength. He was taking 200 mg. of Ibuprofen. [AR 266.] He had reached maximum medical improvement and could have recurrences of pain. [AR 266.] Torres was rated with a 15% total disability of the cervical spine and a total of 20% total disability of the lumbar spine, along with a total of 4% loss of hand motion. His whole body impairment was 38%. The doctor observed that 50% of Torres's impairment was caused by spondylosis and deconditioning while the other 50% was injury-related. [AR 266.]

11

### *2008 Records*

On January 11, 2008, Torres was seen at Ben Archer for his cough, hypertension, and cholesterol levels.  He worked in sandblasting.  He was to continue his medications for hypertension.  His hypertension was noted as stable.  [AR 301.]

Torres claims that February 1, 2008 is the onset date of his disability.  [AR 51, 114.]

On February 8, 2008, Torres was seen at Ben Archer to follow up on his lab results.  He suffered from hypertension but it was stable, and he had no new complaints. [AR 300.]

On February 8, 2008, there is a "Progress Note," which is from the VA Medical Center.  The record indicates Torres did not experience pain on that date and was not being treated for pain.  [AR 410.]  He was instructed to exercise and improve his diet and reduce weight.  [AR 410.]

On February 11, 2008, Torres was again seen at the VA Center.  He had requested a chest x-ray, stating he had left his last job "secondary to the possibility of asbestosis exposure."  [AR 408.]  There were no objective findings related to this complaint.  Torres was a non-smoker and was not coughing.  He declined a colonoscopy and any preventive healthcare measures, along with labs.  The record notes a history of obesity and a history of dyslipidemia.[15]  [AR 408.]

On March 7, 2008, Torres applied for SSI and DIB benefits.  [AR 11.]

On March 10, 2008, Torres was seen at the VA for HTN and blood pressure

_____

[15]Dyslipidemia is an abnormal amount of lipids (e.g. cholesterol and/or fat) in the blood. en.wikipedia.org/wiki/Dyslipidemia (10/5/11).

medications.  He declined any labwork.  He deferred a physical examination.  He was told that if the VA were going to assist him with medications, they would need his lab results.  [AR 403, 405.]

On March 14, 2008, Torres had a face-to-face interview with a disability services employee.  [AR 138.]  The only problem observed was his ability to sit.  Torres was working 32 hours per week at $10/hour from February 2, 2007 to February 1, 2008. There was a recommendation that his onset of disability be designated as February 1, 2008, when he ceased working as much.  [AR 138–39.]

A chest x-ray performed March 21, 2008 was negative for asbestosis and unremarkable for the most part.  [AR 409.]

Torres filled out a disability report in about April 2008.  [AR 142.]  He was limited in his ability to work by his back injury, high blood pressure, and chronic bronchitis.  [AR 143.]  He could stand or sit for long periods of time but could not lift more than 20 pounds.  He could not stoop as he had pain from his back radiating into his legs.  He could not bend.  These problems started to affect him as early as 1991, but he was unable to work as of February 1, 2008.  [AR 143.]  Torres stated he could not keep a full time job because of his back injury so he attempted to work part time.  The back pain was worse now.  He had worked as an auto detailer, machinist, sandblaster, security guard, and tire technician.  [AR 144.]  He received physical therapy in 2007 after the car accident and had been seen in 2002 for a back injury.  He also stated he was seen at Memorial Medical Center in Las Cruces from 1990-2003 for back pain but there are no contemporaneous medical records.  Torres took only Ibuprofen for pain and did not specify the amount he took.  He completed his GED in about 1977.  [AR 149.]

13

On April 11, 2008, there is a handwritten function report prepared by Torres. [AR 165.] He lived at home. His typical day consisted of waking up, taking a shower, getting dressed, eating, taking medications if he was in pain, and "taking it easy." He was careful not to do too much. He could attend doctors' appointments and do a load of laundry but typically stayed at home. [AR 165.] Before his disability, Torres was able to work, play basketball, and go camping. He was very social previously. Now, he could not find a comfortable position in which to sleep. [AR 166.] He had difficulties with personal care. He could fix himself pre-prepared food for meals although he used to cook. [AR 167.] He did not do yard work because he suffered too much pain. [AR 168.] Torres went out into the yard about five times a day. He could drive alone and go grocery shopping once a week. He was able to pay his bills. [AR 168.] He was unable to physically perform activities he used to enjoy, e.g., playing pool and basketball, reading, working on cars. He visited his sister's home two times a week. Almost every aspect of his physical activities was affected, including lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, seeing, and completing tasks. His memory was all right. Chronic pain from his back affected him. He could walk one block before resting and could pay attention for 15 minutes. Torres stated he used a cane if he walked. [AR 171.] There are no records indicating he was ever prescribed a cane.

On June 30, 2008, Torres was seen at Ben Archer for complaints of left leg pain. He was having difficulties walking. He wanted to follow up on his hypertension. He described having pain off and on for five years. His car accident occurred about one and a half years ago. He had run out of his prescription for Tricor two weeks ago but was

taking his blood pressure medication.  [AR 298.]

On July 26, 2008, Torres was evaluated by a disability services physician – Dr. Carlos Pastrana.  [AR 320.]  Torres reported lower back pain "for many years," that became worse after his car accident.  He did not know the results of his 2007 MRI exams.  He described his condition as chronic lower back pain and rated the pain as a 9 of 10.  Torres's pain increased when he was standing, lifting or bending.  The pain radiated down the side and front of his legs.  He limped.  He awoke at night from pain. Ibuprofen helped a little with the pain.  Torres also stated he had a history of chronic bronchitis with a last bout at the beginning of July (this appears to have been July 2007). He coughed, wheezed and had trouble breathing but could not say how often this condition occurred.  He was not taking medication for it.

Torres reported he was diagnosed with hypertension 15 years ago and had been on medication for it since then.  He last worked in February 2008 as a mechanic.  He was able to dress and undress himself, as well as feed himself.  Torres could stand ten minutes and for a period of two hours in an 8-hour workday.  He could sit ten minutes and was not sure how long he could sit during a workday.  He could walk two blocks if the ground was level and could drive for ten minutes.  He did not smoke but drank six beers a week.  He took 800 mg. of Ibuprofen for pain as needed. [AR 321.]  He had pneumonia ten years ago.  He lost his prescription glasses.

During the exam, Dr. Pastrana noted Torres was a well-developed, obese Hispanic male in no acute distress.  Torres ambulated well and was able to get on and off the exam table, as well as in and out of the chair without problems.  He was able to dress and undress.  His breathing was clear and no wheezing was heard.  His gait was antalgic

15

without a cane.   Torres's grip was good and he demonstrate good fine and gross manipulative skills.   He had full ROM except in the shoulders, hips, and knees which could not be tested because of complaints of pain from the lower back.   He also complained of neck pain and exhibited tenderness in the lower lumbar spine.   Torres was unable to walk on his toes and heels and could not squat.   Dr. Pastrana's impressions were degenerative disc disease in the lumbar and cervical spine and decreased ROM with pain in both areas of the spine.   There were signs of radiculopathy in the left leg which resulted in an antalgic gait.   Torres took medication for hypertension.   [AR 322.]

On July 26, 2008, Dr. Werner filled out a physical RFC assessment.   [AR 323.] He limited Torres to lifting 20 pounds occasionally and 10 pounds frequently.   He could stand and walk six hours a day and sit six hours a day.   Torres's ability to push or pull was unlimited.   [AR 324.]   Dr. Werner summarized the medical records demonstrating herniations.   He also noted that on October 27, 2006, Torres's gait was normal but his cervical and lumbar ROM were restricted by about 50%.   On March 13, 2007, Torres was performing light duty work and requested a full release to work.   He demonstrated a minimally restricted cervical ROM and a normal gait on that date.   He had full ROM in the lumbar spine then.   On September 6, 2007, Torres exhibited normal strength and sensation throughout and the sensory exam was normal.   He was diagnosed with lumbar and cervical sprains.   [AR 325.]   Torres was assessed with occasional postural limitations in all categories, including climbing, balancing, and stooping.   [AR 330.]

On August 13, 2008, Torres's initial application for disability benefits was denied.   Disability services noted that it had reviewed the 2008 medical records and that Torres claimed he was disabled due to a back injury, hypertension, and chronic

16

bronchitis.  [AR 86, 92.]

On September 8, 2008, Torres submitted a disability report with his appeal.  He complained that his pain was worse and that the lumbar spine pain was more chronic with weather changes.  The pain was more severe and it was more difficult to warm up his muscles in the morning.  Torres reported that he had a difficult time walking and that his leg was acutely painful and caused him to limp.  The pain radiated down his leg.  This change in pain began on April 15, 2008.  [AR 189.]  Torres's blood pressure was erratic.  It caused spasms in his head and dizziness, which also began on April 15, 2008.  [AR 190.]  In June 2008, Torres was referred to Dr. Goldsmith in Las Cruces for back pain.  [AR 191.]  He went to Memorial Healthplex in January 2008 for an asthma attack.  [AR 192.]  Torres was taking medications for high blood pressure and high cholesterol.  [AR 193.]  No pain medications were mentioned on this form.  Torres stated it was more difficult to bend in the shower and to reach upwards with his arms, especially on the left side.  He needed more assistance and had trouble walking any distance and climbing stairs.  It was impossible to wake up early due to pain and lack of sleep.  He was able to dress himself and pick up after himself.  His sister helped him clean.  He was driving less.  [AR 194.]

On September 30, 2008, there is a handwritten function report.  Torres lived in a house with friends.  He awoke between 6 and 8 a.m. and got dressed and showered.  He ate and took pain medications.  He was not able to do much.  Torres went to doctors' appointments, did the laundry, and generally stayed at home.  He used to play sports, work and camp.  [AR 198.]  He now had difficulty with personal care.  His sister helped him.  He was still able to do some laundry.  [AR 199.]  Torres did no yard work but did

go outside a few times a day.  He still could drive and go to the grocery store.  [AR 200.] He could manage his finances.  [AR 203.]

On October 20, 2008, Torres went to Ben Archer for a follow-up appointment concerning his hypertension.  He was not employed and had not been able to afford his hypertension medication for six weeks.  His hypertension was stable and he was to continue with his current medications.  He would apply for indigency assistance that day. [AR 335.]

On December 2, 2008, Torres's applications for reconsideration were denied. [AR 88, 89, 97, 362.]

On December 4, 2008, there is a VA Progress Note that possibly indicates Torres had a screening for depression in February 2008.  However, there is no contemporaneous medical record in February 2008 documenting a complaint of depression.  [AR 398.] Torres was taking 800 mg. of Ibuprofen for pain and Loratadine for allergies.  His main complaint was "health maintenance."  He had been to Ben Archer for various medical complaints and was taking medications for hypertension and for lipids management.  He requested counseling on this date due to sexual abuse he suffered as a child.  He reported his pain as a level 5 or greater.  There were no visible signs of anguish.  The medical provider observed a "mismatch" between the stated pain score and Torres's presentation at the clinic.  [AR 399.]  Torres's lungs were noted as clear.  Torres intended to pick up his lab results from the private sector provider.  He declined a cholesterol screen and refused various exams and vaccines.  [AR 399.]  He was counseled concerning the health risks of obesity.  [AR 401.]  The health care provider discussed a referral to "MOVE" or another weight loss program.  Torres refused the referral.  His alcohol screening test was

negative.  This record indicates Torres was negative for depression.  He was not feeling "down at all."  [AR 402.]

There is a disability report dated December 29, 2008.  [AR 216.]  Torres reported that he had more severe pain in his spine and could not get out of bed due to pain.  Pain also prevented him from walking.  His legs hurt at night, and he was limping from both legs.  Torres was working part time as a janitor at Kohls but it was difficult.  These changes in his condition occurred on October 1, 2008.  [AR 217.]  Torres took 800 mg. of Ibuprofen for pain.  He needed a long time to perform personal care.  His sister did the cleaning and cooking.  He rested so that he could work part time.  [AR 219.]

### *2009 Records*

The first therapy record in Torres's administrative record is dated March 19, 2009.  [AR 367.]  Torres went to the Southwest Counseling Center for a psychiatric evaluation.  He was taking Ibuprofen and medications for hypertension and cholesterol. He reported having trouble sleeping and had flashbacks related to severe child abuse.  He also suffered from hallucinations.  He had little energy and isolated himself.  He was sad and irritable and wanted to stay in bed.  This record notes that Torres had been a prior client of Southwest Counseling Center in 2001, although there are no contemporaneous records of treatment then.  Torres reported he suffered from depression since childhood, secondary to both physical and sexual abuse.  He never discussed the abuse before.  He drank to cope but was not drinking now.  He had feelings of guilt and shame.  A female babysitter sexually abused Torres when he was 11 years old but he never told his family.

Torres also had attended DWI classes in the past and drug court for one year. When asked about his alcohol consumption, he responded "hardly," and maybe one time

a week.  He had used alcohol and marijuana in the past.  [AR 368.]  Torres had a DWI in 2001 and two prior DWIs.  He claimed that his parents were also physically abusive to him and that they were always drinking.  [AR 369.]  Torres was observed as being depressed with fair insight or judgment.  He was positive for hallucinations.  [AR 370.] He was given a diagnosis of PTSD, with a history of alcohol dependence.  He was also diagnosed as "major depressive."   The health care provider recommended anti-depressants, including Wellbutrin and Zyprexa.  Torres was panicky and observed to be sad and anxious.  He had impaired concentration and limited insight and judgment.  [AR 373.]

The psychological evaluation notes that Torres had been seeing "Arlette from Community of Hope last two months," although there are no contemporaneous records for treatment.  Torres had a history of alcohol abuse.  Therapy and medication were recommended.  [AR 373, 374.]  Torres required financial assistance and was "SDMI" qualified.  He denied any current problem with drugs or alcohol.  [AR 383.]  A treatment plan was described.  [AR 384.]

On March 25, 2009, there is a VA Progress Note, listing Torres's medications, including Gemfibrozil[16] and Tramadol.[17]  [AR 393.]  A more detailed Progress Note from this date indicates Torres was being seen for back pain and numbness in his legs.  These problems had lasted one year after his injury, although the car accident occurred back in 2006.  This record states that Torres "was workman's comp, had MRI done but says

---

[16]Gemfibrozil is used with diet changes (restriction of cholesterol and fat intake) to reduce the amount of cholesterol and triglycerides.  www.nlm.nih.gov (10/5/11).

[17]Tramadol hydrochloride (Ultram, Tramal) is a centrally acting opioid analgesic, used in treating moderate to severe pain.  en.wikipedia.org/wiki/Tramadol (10/5/11).

'they never' did anything, can't say whether he went to neuro/neurosurgeon and never did anything. Not on any meds." [AR 394.] Torres had less feeling in his left leg and his foot hurt a lot when he walked a lot. He exhibited full ROM in his back. His motor strength was symmetric and grossly intact in the lower extremities. He had a mild shuffling gait but his heel and toe walking were within normal. His back pain presentation was not acute, but "there are breaks in the story presented." Torres advised the VA that "they didn't do anything," but the nursing staff overheard him say otherwise on the telephone and that his claim was going well. Torres needed to sign a release for the MRI results as this health care provider could not be certain what his real status was. Torres received a prescription of Tramadol for one month for pain management. During another visit Torres stated he would have insurance in January but that did not occur. Also, Torres reported that Ben Archer was only doing dental care for him but this seemed uncertain. Torres was limping and wanted x-rays of his legs and lower back. He needed refills of his other prescriptions. The PTSD screen was positive. [AR 396.]

On March 30, 2009, a VA Progress Note indicates Torres was not doing well with bringing down his triglycerides. He was referred to a class for nutrition. [AR 412.] On August 6, 2009, he called the VA asking about signs of colon cancer. Torres claimed to be having bowel incontinence for the past five years, off and on. The record indicates Torres's back injury and related pain was a workman's compensation case and that he was to have a hearing. [AR 390.]

On September 24, 2009, Torres's disability attorney sent a "pre-hearing" letter to the ALJ. [AR 253.] Torres was not requesting to open an old disability application that was denied in February 2005. [AR 253.] While Torres had worked part time in 2008

after the onset date, this did not disqualify his benefits application.

On September 30, 2009, the ALJ held a video hearing in El Paso where Torres was present.  The ALJ presided from Albuquerque and could observe Torres on a video monitor.  Torres was represented by an attorney, who was with him in El Paso.  [AR 11, 47, 48.]  Torres's attorney described two main impairments: a disorder of the spine with several disc herniations and depression.  [AR 50.]  Torres's work history was described in detail.  [AR 51-53.]  As of February 1, 2008, Torres stated he could walk 15 feet before his back and lower legs hurt.  He also testified he used a cane and had started using one in March 2008.  However, he did not have a cane on the day of the hearing. [AR 55.]  Torres last used the cane a week ago.  He could stand for about ten minutes and sit for ten minutes.  He could lift ten pounds.  [AR 56.]

Torres admitted that a doctor had not prescribed a cane for him and that Torres himself had decided to use one.  He stated he used a cane most of the time and that it was rare for him to leave home without it.  [AR 57.]

Torres testified that his depression began when he was hurt in February 2008. [AR 57, 58.] He actually was injured in the auto accident in late 2006.  Torres stated he had been seeing a therapist for the last six months.  He did not go to counseling before this because he had no insurance.  [AR 58.]  He claimed that a counselor or psychiatrist at Southwest Counseling Center was seeing him every two weeks or every month.  [AR 58, 59.]  There are no contemporaneous therapy records from Milen Moreno or Veronica Valenzuela, who apparently were therapists or psychiatrists.

Torres claimed he was depressed because he could not do what he used to do. His depression was key to his inability to work and function.  He testified that his

depression was also related to his childhood. "I was kind of starting to have sexual abuse and mental abuse when I was growing up." [AR 59.] He stated he was taking Lexapro, Wellbutrin, and Cymbalta, along with Ibuprofen. [AR 60.] He felt his pain was a 10 on a scale of 1 to 10. He had never been hospitalized for back pain. He had an appointment with an orthopedic doctor on November 10 [AR 62] and had received some treatment from an orthopedic physician after his accident. [AR 63.]

In February 2008, he could not stand up for long periods of time without a lot of back pain and had to stop working. [AR 63, 64.] He also said he was laid off because of his inability to perform his duties. [AR 64.] He complained that his legs "locked up." He also reported that he had bowel incontinence that began six months earlier. Torres believed that the incontinence was related to his back problems as advised by a doctor., although no medical record confirms this. [AR 66.] Torres was living alone and was homeless. [AR 66.] He was living with friends who were staying at a mission that night.

Torres had trouble showering and dressing. He felt hopeless and helpless and that he could not do anything. He suffered from anxiety attacks. [AR 68.]

At this point in the hearing, the ALJ read from a July 2008 medical record that indicated Torres was not having significant problems physically and was not using a cane. [AR 68-69.] Torres then admitted he shared a cane with his brother even though he also claimed to use a cane five days a week. [AR 70.]

A vocational expert testified at the hearing. She found that Torres could not perform his past relevant work because he could only perform light level work. [AR 74.] The ALJ provided a hypothetical where Torres was limited to light level work and could occasionally climb ramps and stairs but could not climb ladders or ropes. He could

23

occasionally balance and stoop and could concentrate for two hours before needing a break.  Torres could complete an 8-hour workday and could respond to changes in his work.  Under this hypothetical, the VE testified that Torres could perform the jobs of gate guard, ticket taker and file clerk.  [AR 75.]

The ALJ then provided a second hypothetical where Torres could not concentrate or stay on task for up to two hours, whether due to physical or mental limitations.  [AR 76.]  The VE testified Torres could not perform the previously identified jobs with that limitation.

The ALJ provided a third hypothetical (that included restrictions from the first hypothetical) where Torres had to be afforded an option to sit and stand one to two minutes every hour or so.  [AR 77.]  The VE testified that Torres could still perform the jobs of gate keeper and file clerk but perhaps not that of a ticket taker.  However there were other possible jobs he could do, including a silver wrapper position.

Torres's attorney asked the VE whether Torres had skills transferable to sedentary work.  The VE testified that Torres might be able to perform a dispatcher job which was sedentary.  The ALJ then provided a fourth hypothetical where the individual has general knowledge of automobiles from past jobs.  [AR 82.]  The record was left open until Torres's November 10 doctor's appointment.  [AR 84.]

On October 1, 2009, there is a medical record from First Care Clinic.  Torres complained of lower back pain with pain radiating down both legs.  His "toe touch" was limited by about 90%, and he was limited in the ability to twist.  He could stand on tip

toes.   He was taking 60 mg. of Toradol[18] for pain.   He was going to a doctor in Albuquerque on October 3, 2009.  An MRI was ordered. [AR 418.]

An MRI of the spine was performed on October 13, 2009.  [AR 420.]  A number of mild and minimal disc bulges were identified,  There was mild spinal canal stenosis and moderate intervertebral disc space narrowing at different locations.  The impression was: at L4/L5, mild to moderate right central/foraminal disc protrusion superimposed on moderate circumferential disc bulge.  Results in moderate right neural foraminal stenosis.  The exiting L4 nerve roots contact bulging disc without appreciable mass effect.  Multilevel degenerative changes were moderate but without moderate or severe spinal canal stenosis.  [AR 420-21.]

It is not confirmed in the record whether Torres saw a doctor on October 3, 2009 in Albuquerque or whether he saw the orthopedic physician on November 10.

On November 24, 2009, Torres's attorney sent the ALJ another letter arguing he should be limited to a sedentary category of work.  [AR 416.]  The attorney also argued in the letter that the VE's testimony concerning the sedentary hypothetical at the hearing was incorrect.  [AR 417.]

***2010 Records***

---

[18]Ketorolac is used to relieve moderately severe pain, usually after surgery.  www.nlm.nih.gov (10/5/11).

On February 8, 2010, the ALJ issued a decision denying benefits to Torres.  [AR 8, 11-20.]  On March 18, 2010, Torres's attorney asked for review of the adverse decision.  [AR 5, 6.]  On September 21, 2010, the Appeals Council denied the request for review.  [AR 1.]

## V.  DISCUSSION

Torres claims that the ALJ committed legal error in failing to follow the correct procedure for evaluating mental impairments and documenting the procedures.   In addition, Torres argues that the ALJ committed legal error in failing to consider Torres's severe impairment of depression in the RFC analysis. [Doc. 16, pp. 7-10.]

### A.    Depression Evaluation

In his decision, the ALJ determined that Torres's depression did not meet or equal a listing, namely listing 12.04 (affective disorders). [AR 14.] The ALJ discussed that he considered whether the "paragraph B" criteria were satisfied.  To satisfy those criteria, the mental impairment must result in at least two marked restrictions.  The ALJ listed those restrictions and defined a "marked limitation" in his decision. [AR 14.] He concluded that Torres's depression did not cause at least two "marked" limitations or one "marked" limitation and "repeated episodes of decompensation.  Thus, the "paragraph B" criteria of listing 12.04 were not satisfied.  The ALJ also decided whether the "paragraph C" criteria were satisfied and found that the evidence failed to establish the presence of "paragraph C" criteria. [AR 14.]

Torres does not expressly argue that his depression did meet or equal a listing. Instead, his position is that the ALJ failed to properly document "application of the [special] technique" relying on 20 C.F.R. §§ 404.1520a(e), 416.920a(e). [Doc. 16, p. 8.]

26

Torres conceded that the ALJ recited the applicable criteria under 12.04 but claims he "gave a conclusory statement that Plaintiff's depression did not cause marked limitations or repeated episodes of decompensation such that his depression failed to satisfy the requirements of [12.04] but did not document application of the technique by assigning the level of severity of limitation of each of the 'paragraph B' criteria." [Doc. 16, p. 8.] Torres further asserts that the ALJ did not discuss any of the medical evidence concerning his depression.

The Commissioner acknowledges that the ALJ should have included his specific findings regarding Torres's degree of limitation in each of the four criterion. [Doc. 17, p. 4.] However, the Commissioner asserts this was harmless error.

This Court agrees that any error by the ALJ to specifically discuss the evidence and "paragraph B" criteria in more detail was harmless.  While the ALJ summarized the pertinent criteria, without discussing the related evidence, it is clear that ALJ utilized the pertinent technique in evaluating Torres's depression.  Moreover the ALJ noted that Torres testified he had depression and was taking several medications, as well as undergoing psychological and psychiatric treatment. [AR 16.]

This was about all the evidence of depression in the administrative record to which the ALJ could refer.  It is noteworthy that Torres made no complaints of depression in the medical records or disability services forms until 2009.  Even though February 1, 2008 is the onset date of disability, none of the early 2008 medical records or disability reports (filled out by Torres) discuss depression or medications for depression. Only in December 2008 did Torres make his first documented request for counseling related to sexual abuse as a child. [AR 398.]

In March 2009, Torres had a psychiatric intake evaluation at Southwest Counseling Center. [AR 367.] This is the first medical record where complaints of hallucinations and allegations of depression since childhood were made.  This was also the first medical record that documents recommendations of anti-depressant medications. While a detailed treatment plan was developed for Torres as of March 18, 2009 (to June 16, 2009), the administrative record does not contain a single therapy or psychiatric treatment record after the March intake form. [*See* AR 384-86.]

The ALJ observed that regarding allegations of depression, Torres testified he saw a psychiatrist and counselor once every month for a preceding six-month period and that he was taking three medications for depressive symptoms. [AR 16.] The ALJ may have been rather generous in omitting any mention that there are no corresponding treatment records confirming that Torres attended such appointments and received mental health treatment.

In addition, during the ALJ hearing Torres stated his depression had started when he was injured in February 2008 [AR 57-58], rather than in childhood as he reported during the earlier psychiatric intake evaluation [AR 367-68].  Moreover, Torres's claim that his depression started in February 2008 when he was injured appears inaccurate based on the motor vehicle accident that caused Torres's injury in late 2006.

While the ALJ did not expressly rely on these inconsistencies, the ALJ noted that he had carefully considered the entire record [AR 14] and that Torres's credibility was suspect. [AR 17.] The ALJ did observe that medical health care providers questioned Torres's veracity and noted "breaks" in his story as to other alleged limitations. [AR 16.]

Under the circumstances of this case, the Court concludes that any error by the ALJ was harmless. This is particularly true where Torres neither contends that his alleged depression was of listing level severity, nor identifies evidence to support such a contention. *See* Allen v. Barnhart, 357 F.3d 1140, 1145 (10th Cir. 2004) (harmless error may be applied "where, based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.") *See also* Carpenter v. Astrue, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence.")

No reasonable administrative factfinder, even following the correct analysis, could have found evidence to support a finding that Torres's alleged depression met or equaled a listing. Moreover, the ALJ did not deny Torres's claim for benefits at step two or three. He proceeded to step five of the sequential evaluation before denying Torres's applications.

### B.   RFC Evaluation

Torres argues that while the ALJ decided Torres's depression at step 2 was a severe impairment, he failed to consider the depression when assessing Torres's RFC and failed to consider "what effect the Plaintiff's depression had on his ability to perform any work-related mental activities . . . ." [Doc. 16, p. 9.]

In his decision, before reaching the RFC findings, the ALJ stated that his RFC assessment "reflects the degree of limitation the undersigned [ALJ] has found in the

29

'paragraph B' mental function analysis." [AR 14.] In the RFC assessment, the ALJ commented that he had carefully considered the entire record, along with all of Torres's symptoms and the extent to which those symptoms could reasonably be consistent with the objective medical evidence and other evidence. [AR 14.] The ALJ further noted that when a physical or mental impairment could reasonably be expected to produce certain symptoms, then the ALJ had to evaluate the effects of the claimant's symptoms to determine who those symptoms limited the claimant's ability to do basic work activities. In performing this evaluation, the ALJ observed that he had to reach findings as to the claimant's credibility as well. [AR 15.]

Included in the ALJ's RFC assessment is his acknowledgment of Torres's testimony concerning his depression, medication, and related treatment. [AR 16.] The ALJ also commented that the evidence suggested and even implied that Torres was "more interested in establishing a disability case rather than getting better and returning to gainful employment . . . ." [AR 17.]

Moreover, as part of the RFC assessment, the ALJ limited Torres's ability to concentrate to only a two-hour period and required that he be allowed a break before returning to another two-hour work period.  While the ALJ did not expressly state he included this limitation as part of Torres's RFC because of complaints of depression, it clearly takes into account mental limitations. [AR 14.]

In addition, Torres did not identify any evidence of mental limitations to support his general argument that the ALJ erred in the RFC assessment by omitting allegations of depression.  Torres fails to identify any mental limitation supported by the record that the ALJ should or could have included in his hypotheticals or RFC assessment.  It is worth

30

noting that Torres, despite belated allegations of depression from childhood, did not claim he was disabled from any mental limitation when he applied for benefits in March 2008. [AR 143.]

The ALJ properly considered any and all evidence of Torres's allegations/ complaints of depression in the RFC assessment.  To the extent that the ALJ erred by not providing more specific analysis and discussion of the depression in his detailed RFC assessment, the error was harmless.  This is true because there is scant evidence of depression or impairments due to depression in the administrative record, notwithstanding the ALJ's determination at step two that Torres had a severe impairment of a "history of depression."

## **RECOMMENDATION**

For all of the above-stated reasons, the Court recommends denial of Torres's complaint and proposes that the Court reverse and dismiss this matter, with prejudice.


_Lorenzo F. Garcia_
Lorenzo F. Garcia
United States Magistrate Judge